UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| TRAVIS MCKENZIE, | ) | |
| Plaintiff, | ) | Civil Action No. 4:14-cv-00049 |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Travis McKenzie asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision terminating his disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401–434.[1] On appeal, McKenzie argues

that the Administrative Law Judge ("ALJ") erred in finding that medical improvement had

occurred and in determining the extent of McKenzie's functional limitations. Pl. Br. 20–27, ECF

No. 16. He urges the Court to reverse the Commissioner's decision and to reinstate benefits or to

remand his case for a new hearing. *Id.* at 27. This Court has authority to decide McKenzie's case

under 42 U.S.C. § 405(g), and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B).

ECF No. 12.

After reviewing the administrative record, the parties' briefs, and the applicable law, I

find that the Commissioner's decision is supported by substantial evidence. Therefore, I

recommend that the Court **DENY** McKenzie's Motion for Summary Judgment or for Remand,

---

[1] McKenzie was initially awarded supplemental security income ("SSI") under Title XVI of the Social
Security Act, 42 U.S.C. §§ 1381–1383f, along with DIB. *See* Administrative Record ("R.") 58–59, ECF
No. 9. The portions of the administrative record dealing with the termination of McKenzie's benefits only
refer to DIB, however, and do not address SSI. *See, e.g.*, R. 60–63. Although the status of McKenzie's
SSI is unclear, it does not affect my analysis of the merits of this case. Essentially identical standards are
used under both Title II and Title XVI to determine whether a claimant is disabled, *see Craig v. Chater*,
76 F.3d 585, 589 n.1 (4th Cir. 1996), and whether cessation of benefits is appropriate, *see Mullins v.
Astrue*, No. 2:08cv4, 2008 WL 4642988, at *4 & n.4 (W.D. Va. Oct. 21, 2008).

ECF No. 15, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 20,

**AFFIRM** the Commissioner's final decision terminating McKenzie's benefits, and **DISMISS**

this case from the Court's active docket.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision terminating a person's disability benefits. *See* 42 U.S.C. § 405(g); *Guiton v. Colvin*, 546

F. App'x 137, 140 (4th Cir. 2013). The Court's role, however, is limited—it may not reweigh

conflicting evidence, make credibility determinations, or substitute its judgment for that of

agency officials. *See Guiton*, 546 F. App'x at 140–41 (citing *Hancock v. Astrue*, 667 F.3d 470,

472 (4th Cir. 2012)). Instead, the Court asks only whether the ALJ applied the correct legal

standards and whether substantial evidence supports the ALJ's factual findings. *Id.* at 140.

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes

into account the entire record and not just the evidence cited by the ALJ. *See Gordon v.

Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340

U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if

"conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled."

*Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*,

76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual

finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). A disabled person generally is entitled to benefits until he or she dies, reaches retirement age, or is no longer disabled. 20 C.F.R. § 404.316(b)(1)–(3). To determine if a person remains disabled, the Commissioner asks, in order, whether the person: (1) is working; (2) has an impairment that meets or equals an impairment listed in the Act's regulations; (3) has experienced a "medical improvement" in the disabling impairment; (4) has experienced an improvement in his or her ability to work; (5) meets any "exceptions to medical improvement," if applicable; (6) still has a severe impairment; (7) can return to his or her past relevant work; and, if not (8) can do other work that exists in the national economy. 20 C.F.R. § 404.1594(f)(1)–(8); *see also Mullins v. Astrue*, No. 2:08cv4, 2008 WL 4642988, at *4 (W.D. Va. Oct. 21, 2008).

The fact that a person was once "disabled" does not give rise to a presumption that he or she remains disabled. 42 U.S.C. § 423(f). The Commissioner, however, bears the burden of "show[ing] that a medical improvement has occurred and that the improvement relates to the claimant's ability to work." *Edwards v. Astrue*, 4:12cv5, 2012 WL 6082898, at *3 (W.D. Va. Dec. 6, 2012) (Kiser, J.) (citing *Lively v. Bowen*, 858 F.2d 177, 181 n.2 (4th Cir. 1988)). A person's disability "ends" when he or she is again "able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1)(B). If the claimant produces evidence that he or she cannot return to his or her past relevant work, "the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering" his or her age, education, work experience, and limitations. *Hancock*, 667 F.3d at 472–73.

3

## II. Procedural History

McKenzie originally applied for DIB and SSI on March 21, 2006, R. 199, 204, alleging disability caused by a broken leg he sustained in a bicycle accident on January 15, 2006, R. 233, 237. On December 14, 2007, the Commissioner found that McKenzie's impairments (Fractures of Lower Limb and Disorders of Muscle, Ligament and Fascia) matched the criteria of Listing 1.06,[2] and therefore McKenzie was disabled as of his alleged onset date of January 15, 2006. R. 58–59. On July 12, 2012, the Commissioner determined that McKenzie's condition had improved and he could perform sedentary work,[3] and therefore McKenzie's benefits would terminate at the end of September 2012. R. 60–62.

McKenzie contested this determination and appeared with counsel at a hearing before ALJ Marc Mates on June 19, 2013, where he and a vocational expert ("VE") testified. *See generally* R. 36–55. The ALJ issued a written opinion on July 5, 2013, in which he found that McKenzie's period of disability ended on July 1, 2012, and upheld the termination of benefits.

---

[2] The criteria for Listing 1.06 are as follows:

> Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. With: (A) Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and (B) Inability to ambulate effectively . . . and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.06. The regulations further define "inability to ambulate effectively" as "an extreme limitation of the ability to walk" independently, without the use of assistive devices that limit the functioning of the upper extremities, and at a reasonable pace over a sufficient distance. *See id.* § 1.00(B)(2)(b).

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002) (Kiser, J.); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

4

*See generally* R. 19–29. He stated that at the comparison point date ("CPD") of December 14, 2007, McKenzie had the impairment of status-post left knee injury with almost complete fusion (which met Listing 1.06), and that McKenzie did not work between the CPD and July 1, 2012. R. 20–21. He further found that McKenzie did not develop any additional severe impairments between the CPD and July 1, 2012,[4] and that after July 1, 2012, McKenzie's impairments did not meet or equal the severity of a listing. R. 21. He next determined that, based on the medical evidence, McKenzie's impairment had medically improved as of July 1, 2012, and that this improvement was related to McKenzie's ability to work because his impairment no longer matched a listing. R. 21–22.

The ALJ found that McKenzie had the residual functional capacity ("RFC")[5] to perform light work,[6] "insofar as [McKenzie] could lift 30 pounds occasionally and 10–20 pounds frequently, stand six hours, walk four hours, and sit six to eight hours during an eight-hour workday." R. 22. The RFC finding included additional limitations, namely that McKenzie would

---

[4] The ALJ acknowledged that McKenzie was obese according to his body mass index ("BMI") of 38.2 and that he was recently diagnosed with new-onset diabetes, but found that these conditions were not severe. R. 21 & nn.1–2. The ALJ cited a medical report that indicated McKenzie weighed 274 pounds on July 3, 2012, R. 659, but a year later at his administrative hearing, McKenzie testified that he weighed 239 pounds, R. 46.

[5] RFC is an applicant's *maximum* ability to work "on a regular and continuing basis" despite his or her limitations. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 404.1545(a), and reflects the "total limiting effects" of the person's impairments and related symptoms, *id.* § 404.1545(e); *see also* SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("Any impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.").

[6] "Light work" involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

5

need to extend his leg while seated, could only occasionally bend at the waist, and needed to avoid crouching, squatting, kneeling, crawling, or climbing ladders, ropes, or scaffolds. *Id.* Based on this RFC, the ALJ found that McKenzie could perform his past relevant work as a fast food worker as generally performed, R. 27, or alternatively, could perform other jobs existing in the national and regional (Virginia) economy, including cashier, packer, inspector, machine tender, and order clerk, R. 28. The Appeals Council denied McKenzie's request for review, R. 1–3, and this appeal followed.

### III. Discussion

McKenzie argues that the ALJ erred in weighing the medical opinions and finding that medical improvement occurred after the CPD. Pl. Br. 20–25. He also alleges that the ALJ's RFC finding was erroneous because he did not consider the effect of McKenzie's obesity in combination with his injury and did not include a restriction that required McKenzie to elevate his leg while sitting. Pl. Br. 25–27.

*A.    Medical Improvement*

In order to terminate McKenzie's benefits, the ALJ must have found that, subsequent to the CPD, "medical improvement" in McKenzie's condition occurred and this improvement was related to McKenzie's ability to work. 20 C.F.R. § 404.1594(f)(3)–(4). "Medical improvement" is "any decrease in the medical severity" of an "impairment(s) [that] was present at the time of the most recent favorable medical decision that [the person was] disabled or continued to be disabled." *Id.* § 404.1594(b)(1). ALJs determine medical improvement by comparing "prior and current medical evidence" that must show "changes (improvement) in the symptoms, signs, *or* laboratory findings associated" with the impairment(s) in question. *Id.* § 404.1594(c)(1) (emphasis added); *see also Latchum v. Astrue*, No. 4:07cv42, 2008 WL 3978081, at *3 (W.D.

Va. Aug. 26, 2008) (Kiser, J.) (holding that the Commissioner need only produce "sufficient medical evidence" of improvement and that the ALJ need not base his decision on the same type of medical evidence that the person used to establish the previous disability). A medical improvement is "related" to the person's ability to work "if there has been a decrease in the severity" of an impairment "and an increase in [the person's] functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3). The Commissioner bears the burden of "show[ing] that a medical improvement has occurred and that the improvement relates to the claimant's ability to work." *Edwards*, 2012 WL 6082898, at *3.

B.    *Facts*

    1.    *McKenzie's Condition as of the CPD*

On January 15, 2006, McKenzie fell off a bicycle and sustained an injury to his left leg. R. 531. A CT scan indicated an extremely comminuted fracture of the tibial plateau, R. 457, and on January 19, McKenzie underwent open reduction and internal fixation of the fracture with hybrid external fixation. R. 393–95. Immediately following the surgery, McKenzie was non-weight-bearing and had stiffness in his knee. R. 455–56, 458. He did not appear to have any major complications in his recovery until February 27 when he presented with pain in his thigh, caused by deep venous thrombosis[7] ("DVT") in the leg. R. 455, 489–90. McKenzie received inpatient treatment for the DVT and was discharged on March 4. R. 485–87.

On March 14, 2006, McKenzie's orthopedic physician, Ada Cheung, M.D., referred him to physical therapy, but cautioned that his knee would be very stiff because he had not been able to exercise it before then. R. 453. Katrine Albright, a physical therapist, assessed McKenzie's

---

[7] Deep vein thrombosis occurs when a blood clot forms in one or more of the deep veins in a person's legs. Mayo Clinic, *Deep Vein Thrombosis: Definition*, July 3, 2014, http://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/basics/definition/con-20031922.

7

condition in an initial evaluation dated March 16. R. 426–27. Albright noted that McKenzie reported decreased functional ability with "perform[ing] personal hygiene activities, don[ning] and doff[ing] clothing, squat[ting], standing expected amounts of time at work, stooping tasks, . . . walking tasks such as opening doors, walking and carrying items, walking on uneven terrain, climbing stairs, [and] walking functional distances in an adequate amount of time." R. 426. Albright observed that McKenzie ambulated on crutches and was non-weight-bearing on the left lower extremity. *Id.* He demonstrated minimal active motion of the knee and could not raise his left leg without assistance because of poor strength in the left lower extremity. *Id.* On April 4, Albright noted that although McKenzie's strength had improved, he still had major difficulty bending his knee, ambulated with crutches, and was non-weight-bearing on his left leg. R. 449.

On April 20, 2006, Dr. Cheung removed the external fixator from McKenzie's leg. R. 516–17. She noted that there was no evidence of instability at the fracture site and that it was healed. *Id.* At a follow-up on April 24, McKenzie reported that he had tried putting weight on his left leg, R. 450, and on May 11, Dr. Cheung noted that McKenzie ambulated on a single crutch and could flex his knee to approximately 40 degrees at therapy, R. 602. On June 8, McKenzie had his last visit with Dr. Cheung. R. 601. She noted that he ambulated with a slight limp and used a cane. *Id.* She also found that, although McKenzie's knee was stable and the fracture site was nontender, McKenzie's knee was still very stiff and would likely require further procedures to improve range of motion. *Id.* These procedures would not be possible, however, until McKenzie finished taking Coumadin, which had been prescribed following his DVT. *Id.*

McKenzie began treatment with Jonathan Krome, M.D., in August 2006, *id.*, and he had regular treatments—at least monthly, sometimes weekly—from January through May 2007, R.

8

598–600. During this time, it appears that the stiffness in McKenzie's knee grew worse. Dr. Krome noted that McKenzie's knee had a range of motion of only 5–15 degrees and marked tightness of the patellofemoral mechanism. *Id.* After an ultrasound showed no remaining evidence of DVT, R. 473, Dr. Krome performed an open lysis of McKenzie's adhesions with tendon lengthening on March 1, 2007, R. 480–81. Following this procedure, McKenzie returned to physical therapy on March 12. R. 596–97. McKenzie presented using two crutches and a brace on his knee and was non-weight-bearing. R. 597. Albright noted that McKenzie could not ambulate without an assistive device and that because of pain and difficulty moving he could not use stairs, squat, drive, work, or dress without assistance. R. 596. His passive knee range of motion was -18 degrees extension and 43 degrees flexion. *Id.*

McKenzie continued routine physical therapy through May 2007. *See generally* R. 571–72, 575–82, 584–95. Despite attempts to improve his knee flexion, McKenzie was unable to achieve a normal range of motion in his knee and continued to experience pain. *Id.* On April 19, 2007, McKenzie visited Dr. Krome, who observed moderate muscle atrophy in McKenzie's thigh and a 45 degree range on motion in his knee. R. 583. Dr. Krome prescribed pain medication and gave McKenzie a splint. *Id.* McKenzie returned to Dr. Krome on May 18, and Dr. Krome noted that McKenzie's knee could flex only to 30 degrees. R. 570. Because of the lack of improvement in McKenzie's range of motion, Dr. Krome recommended that McKenzie undergo a manipulation procedure, *id.*, which he performed on May 22, R. 504. During the procedure, Dr. Krome could not manipulate McKenzie's knee past 40 degrees. *Id.*

After a follow-up with Dr. Krome on May 31, R. 569, McKenzie's medical record is silent until November 6, 2007, when McKenzie visited Dr. Thomas Brown at the University of Virginia Health System, R. 635–40. Dr. Brown reported that McKenzie had difficulty standing

and sitting. R. 635. Walking was limited secondary to pain. *Id.* Dr. Brown cautioned McKenzie that he had "limited potential for fantastic improvement with surgical intervention." *Id.* He explained that McKenzie's options included total knee replacement, which was likely to fail because McKenzie was too young, and knee arthrodesis, which would not improve McKenzie's range of motion, but would reduce his pain. *Id.*

The record also contains a limited number of medical opinions dating up to the CPD. This includes one page of a document titled "Work-Related Limitations," completed by an unknown author on March 14, 2006. R. 428. The document notes that McKenzie was limited in lifting more than four pounds; bending over, stooping down, or reaching for objects; standing for more than one hour at a time; walking distances greater than 50 feet; climbing four to six steps; driving an automobile; and taking a bus. *Id.*

The next opinion evidence is a Physical RFC Assessment completed by consulting physician Tony Constant, M.D., on May 12, 2006. R. 459–64. Dr. Constant opined that McKenzie could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours out of an eight-hour day with normal breaks; sit for six hours with normal breaks; frequently climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, or crawl. R. 460–61. Dr. Constant further stated that McKenzie had a medically determinable impairment of Left Proximal Tibia Fracture. R. 464. He observed from the record that McKenzie's gait was non-weight-bearing, his range of motion in his knee was limited, and his recovery was complicated by DVT, but he also noted that McKenzie's mobility had improved and he could lift and move his leg independently. *Id.* Based on his review of the record, Dr. Constant opined that McKenzie would make a satisfactory recovery within 12 months of his injury.

On December 14, 2007 (the CPD), Martin Cader, M.D., evaluated McKenzie's disability claim. R. 645. He observed that McKenzie had sustained a tibial plateau fracture that was followed by post-operative complications, including DVT and arthrofibrosis. *Id.* He noted that McKenzie's improvement was limited, his knee was still very painful and stiff, and he had difficulty sitting, standing, and walking. *Id.* Based on these factors, he determined that McKenzie's condition met the criteria for Listing 1.06. *Id.*

2.    *Subsequent Medical Evidence*

McKenzie's medical record is silent between the CPD and February 28, 2012, when he presented to the emergency room with an abscess on his right thigh, but left before being examined or treated. R. 654–55. The next medical evidence in McKenzie's record is a June 29, 2012, visit to Douglas R. May, M.D., with the reason for the exam noted as "Disability." R. 656. Dr. May observed that McKenzie's knee fracture had healed, but his knee had joint space narrowing and marginal osteophyte formation, which was consistent with severe osteoarthritis. *Id.* Dr. May also found severe osteoarthritis at the patellofemoral joint. *Id.*

The next evidence of treatment in the record is a January 24, 2013, visit with Leslie Powell, a physician's assistant at Cornerstone Complete Care. R. 721–28. Powell noted that McKenzie presented wearing a knee sleeve and had been taking over-the-counter Aleve for pain. R. 721. McKenzie claimed that the pain in his knee rated at 7 out of 10, but that he had not seen another pain specialist before this visit, did not have a medical doctor, and did not have health insurance. *Id.* On McKenzie's musculoskeletal exam, Powell noted negative ballottement, negative bulge sign, a positive Lahman test, and a positive Varus/Valgus Stress Test, as well as pain on flexion and inability to flex his knee. R. 722. Radiology imaging showed that McKenzie had no acute fracture, dislocation, or definite patellar joint effusion, but did have advanced

11

tricompartmental degenerative changes with marked joint space narrowing at all three compartments. R. 726. Powell diagnosed McKenzie with left knee pain, noting that he had bone-on-bone appearance in the knee, and stated that her ability to help was limited because McKenzie could not afford a knee brace or injections. R. 723. Instead, she started him on pain medication. *Id.* After McKenzie's glucose level was measured at 434, he was also diagnosed with new-onset diabetes. *Id.*

The record also includes medical opinions from after the CPD. McKenzie visited William Carter, M.D., with the Virginia Department of Rehabilitative Services on June 30, 2012. R. 659–62. In his medical consultant report, Dr. Carter noted, per McKenzie's statement, that McKenzie's knee ached, particularly when the weather changed, and that McKenzie could not sit if doing so required him to bend his injured knee. R. 659. He also noted that McKenzie claimed he could not walk for more than 20 minutes without stopping and that his knee and leg swelled when he did walk. *Id.* McKenzie told Dr. Carter that his knee brace helped alleviate his symptoms some, but not completely. *Id.* Additionally, Dr. Carter noted that McKenzie had "significant difficulties" walking up stairs, could not use a ladder at all, could not squat, and used a cane to walk long distances. *Id.* McKenzie did not bring an assistive device to this appointment, but Dr. Carter noted that his walking style was "[v]ery circumducted." R. 660. Dr. Carter observed some edema in the left lower extremity and mild pitting around the calf and up to the knee. *Id.* McKenzie's passive and active range of motion in his left knee was only 10 degrees (with 150 degrees being normal), and he had some mild tenderness to palpation. R. 661. McKenzie's gait was normal except for heel and toe walk, as well as some abnormalities with tandem gait. *Id.* Overall, Dr. Carter stated that McKenzie's knee was effectively fused and that he would eventually need a full knee replacement, but was too young at that time. *Id.* Dr. Carter

12

opined that McKenzie was credible and did not claim any limitations that were not "easily identifiable on physical exam." *Id.*

Dr. Carter also assessed McKenzie's functional capabilities. He opined that McKenzie could stand for six hours out of an eight-hour workday, but would need occasional breaks to rest his leg. *Id.* He also opined that McKenzie could walk approximately four hours out of an eight-hour day, but he noted that four hours was "optimistic" and that McKenzie could only do so in 20-minute increments. *Id.* Dr. Carter did not place a limit on the amount of time McKenzie could sit, but also noted that while seated, McKenzie would need to be able to extend his injured leg. R. 662. Because of the stiffness in McKenzie's knee and his abnormal gait pattern, Dr. Carter opined that he could carry 50 pounds occasionally and 15 to 20 pounds frequently and could lift only 30 pounds occasionally and 15 to 20 frequently. *Id.* Dr. Carter noted that McKenzie could not do any postural activities that required bending of the leg, and, therefore, activities such as climbing narrow or shallow stairs and ladders would be "significantly difficult for him." *Id.* He also stated that McKenzie needed a cane for long-distance ambulating. *Id.*

State agency consulting physician David C. Williams, M.D., completed a physical RFC assessment on July 11, 2012, with results similar to Dr. Carter's evaluation. R. 665–72. Dr. Williams opined that McKenzie could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand for approximately four hours with breaks, and sit for about six hours. R. 666–67. Regarding McKenzie's postural limitations, Dr. Williams stated that he could frequently balance and stoop; occasionally climb ramps or stairs; and never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. R. 667. Dr. Williams concluded that McKenzie no longer met the criteria for Listing 1.06 and could perform less than a full range of light work. R. 672. He opined that McKenzie had experienced medical improvement related to his ability to work. *Id.*

13

State agency consulting physician J. Astruc completed another physical RFC assessment on August 27, 2012. R. 681–88. Dr. Astruc made the same findings as Dr. Williams with regard to McKenzie's limitations on lifting, carrying, and sitting. R. 682. Additionally, he found that McKenzie had no limitation on sitting as long as he could extend his left leg. R. 688. He also noted that McKenzie could stand and walk for only two hours per day, R. 682, 688, and was limited in his ability to push, pull, and operate controls with his lower extremities. R. 682. Regarding postural limitations, Dr. Astruc opined that McKenzie could frequently balance, stoop, and climb ladders, ropes, or scaffolds and could never climb ramps or stairs, kneel, crouch, or crawl. R. 683. Although Dr. Astruc stated that McKenzie still had "residual effects" from his injury, he found that the objective medical evidence did not support the alleged intensity and limiting effects of his injury, and so he found McKenzie to be only partially credible. R. 688. Similar to Dr. Williams, Dr. Astruc determined that McKenzie could perform a limited range of light work. *Id.*

3.    *The ALJ's Opinion*

In his written opinion, ALJ Mates stated that McKenzie's impairment no longer met or medically equaled a listing. R. 21. In reaching this conclusion, he noted that "[s]tate agency medical consultants on recent reviews of the evidence found no listing level impairment, and no treating or examining physician has identified findings to support a conclusion of listing level severity." *Id.* Because of this finding, as well as the absence of evidence in the record that McKenzie still had a tibial fracture without solid union and an inability to ambulate effectively, the ALJ determined that medical improvement related to McKenzie's ability to work had occurred. R. 21–22.

The ALJ discussed McKenzie's statements and the medical records and opinions in explaining his assessment of McKenzie's medical improvement and RFC. He acknowledged that McKenzie arrived to the hearing using a cane for ambulation and that he reported wearing a leg brace every day, propping up his leg and using ice at home to reduce swelling, and taking medication for pain. R. 23. He also noted McKenzie's testimony that he could occasionally bear his full weight on the injured leg and that he managed his own personal care, including showering and dressing himself, with occasional assistance from his fiancée with putting on his shoes. *Id.* He acknowledged McKenzie's testimony that he had difficulty going up and down stairs, but noted that McKenzie reported leaving his home three to four times per week despite having to take three flights of stairs to do so. *Id.*

The ALJ stated that McKenzie's medical records indicated that he had endorsed some improvement with his knee brace, could ambulate effectively, and used a cane only to walk long distances. R. 26. He noted moderate findings from diagnostic imaging, including degenerative changes such as joint space narrowing, but no acute fracture, dislocation, or suprapatellar joint effusion. *Id.* He opined that McKenzie's sparse work history, with his most recent job predating his injury by about two years, suggested that McKenzie's current unemployment was not caused entirely by his medical problems. *Id.* The ALJ found McKenzie's lack of medical treatment between 2007 and 2013 to be significant. *Id.*

The ALJ also evaluated the opinion evidence in the record. He gave partial weight to Dr. Williams's July 2012 opinion, noting that his opinion was balanced and his findings reflected a thorough review of the record. *Id.* He also gave weight to Dr. Carter's evaluation because it was "consistent with the longitudinal evidence of record," particularly the findings that McKenzie could manage his personal needs and perform a range of daily activities. R. 26–27. He gave less

Case 4:14-cv-00049-JLK-JCH   Document 22   Filed 11/05/15   Page 15 of 24   Pageid#: 844

weight to Dr. Astruc's opinion, particularly his finding that McKenzie could never climb stairs, which was inconsistent with McKenzie's own testimony that he took the stairs multiple times per week when he left his residence. R. 27. He gave little to no weight to the opinions of state agency consultants who evaluated McKenzie prior to his initial award of benefits, noting that these evaluations were irrelevant to McKenzie's current disability status.

C.    *Analysis*

1.    *Medical Improvement*

McKenzie contends that the ALJ's evaluation of the medical records and opinions was flawed and that this evidence did not support a finding that medical improvement had occurred. He asserts that, rather than showing improvement, his post-CPD medical records show that his condition has deteriorated. Pl. Br. 22–25. For example, he cites to Dr. Carter's June 2012 observation that McKenzie could only flex his knee 10 degrees, R. 661, and compares this to the attempted manipulation performed by Dr. Krome in 2007, which achieved 40 degrees of flexion, R. 504. This is not a helpful comparison, however, because the degree of flexion attained during the manipulation procedure is not indicative of McKenzie's ordinary movement. McKenzie fails to note that Dr. Krome was able to move McKenzie's knee 40 degrees only by applying a significant amount force while McKenzie was under anesthesia. *Id.* Dr. Carter, meanwhile, observed 10 degrees of ordinary passive and active motion. R. 661. McKenzie also views this evidence in isolation, even though at other times prior to the CPD his range of motion was limited to as little as 5–15 degrees. R. 600. When viewed as a whole, the record does not show that McKenzie's ability to move his knee deteriorated significantly after the CPD. At most, it shows that the range of motion remained limited.

16

McKenzie also argues that the ALJ failed to give proper weight to the opinion of examining physician Dr. Carter in comparison to the opinions of the state agency consulting physicians. Agency regulations instruct ALJs to weigh each medical opinion[8] in the applicant's record. 20 C.F.R. § 404.1527(b). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* § 404.1527(c). Opinions from non-treating sources are not entitled to any particular weight. *See id.* Rather, the ALJ must consider certain factors in determining what weight to give such opinions, including the source's familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other evidence in the record. *See id.* The ALJ must explain the weight given to all medical opinions and the reasons for that weight. *See Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013); 20 C.F.R. § 404.1527(e)(2).

McKenzie seems to claim that the ALJ ignored Dr. Carter's opinion and instead adopted the opinion of one of the state agency consulting physicians. Pl. Br. 25. This argument is inconsistent with the ALJ's opinion, however, in which he gave partial weight to both Dr. Carter's opinion and that of state agency consulting physician Dr. Williams, while affording less weight to the opinion of state agency consulting physician Dr. Astruc. R. 26–27. Furthermore, it is doubtful that, had the ALJ given more weight to Dr. Carter's opinion and less to Dr. Williams's opinion, he would have found that medical improvement had not occurred. As the

---

[8] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

ALJ explained, "no treating or examining source has suggested that [McKenzie] is currently disabled, or that he requires greater limitations than those set forth [in the RFC finding]." R. 27.

McKenzie further argues that his lack of medical treatment between 2007 and 2013 proves that his condition could not have improved during that time, rather than demonstrating the absence of a serious impairment. Pl. Br. 22. He does not offer any reason for asserting that a lack of treatment would necessarily result in worsening of his condition. This argument ignores the stark contrast between McKenzie's numerous medical visits and physical therapy sessions leading up to his CPD and the complete lack of treatment since. Significant gaps in a claimant's treatment record can weigh against his credibility unless he has "good reasons" for his failure to obtain treatment or noncompliance with treatment recommendations. *Mabe v. Colvin*, 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) (Kiser, J.) (citing SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996)). Here, the ALJ observed that, since the CPD, McKenzie "has not generally received the type of medical treatment one would expect for a completely disabled individual." R. 26. The ALJ's inference that the absence of treatment over a period of more than five years signifies a degree of medical improvement is reasonable, and McKenzie has not offered a good reason for failing to seek treatment during this period.

Ultimately, these arguments, along with other evidence McKenzie notes, such as findings of joint space narrowing, "bone on bone" appearance, and traumatic arthritis, Pl. Br. 23, do little to refute the ALJ's finding that the *overall* condition of McKenzie's knee injury had improved since the CPD. Other signs of medical improvement include McKenzie's ability to bear weight on his left leg, *compare* R. 672, *with* R. 464, dress himself with minimal assistance, R. 44–45, and take three flights of stairs from his apartment to perform routine activities such as grocery shopping, going to church, paying bills, and even simply going outside twice a day, R. 315–16.

18

By comparison, prior to the CPD McKenzie used two crutches to ambulate, could not bear weight on his left leg, required assistance dressing himself, and was completely unable to use stairs or drive. R. 596–97. This evidence of improvement in McKenzie's symptoms is sufficient to show medical improvement even though it is of a different type than the evidence used to show disability at the CPD. *See Latchum*, 2008 WL 3978081, at \*2–3 (noting that a claimant's symptoms, as opposed to signs or laboratory findings related to his condition, can provide evidence of improvement even though not initially relied upon to show disability).

In addition, the medical record shows that McKenzie's injury no longer meets the criteria of Listing 1.06, and McKenzie does not argue otherwise. Since the CPD, his tibial fracture has healed, R. 656, and he can ambulate without using assistive devices (except for a cane used for long distances), R. 662, 672. Although the fact that McKenzie no longer meets a listing is not determinative of the issue of medical improvement, *see Rice v. Chater*, 86 F.3d 1, 2 n.2 (1st Cir. 1996), his healed fracture and ability to ambulate without aids both constitute objective signs of medical improvement, *see* 20 C.F.R. § 1594(c)(1). For these reasons, I find that the ALJ's determination of medical improvement is supported by substantial evidence.

### 2.    RFC Determination

McKenzie also asserts that the ALJ failed to consider several factors in making his RFC determination. He first contends that the ALJ failed to account properly for the effects of his obesity. Pl Br. 25–26. In making an RFC determination, an ALJ should consider the combined effect of all of a claimant's impairments, including those he has found to be non-severe. 20 C.F.R. § 404.1545(a)(2), (e). The regulations acknowledge that obesity in particular can compound the effects of other impairments:

> Obesity is a medically determinable impairment that is often associated with
> disturbance of the musculoskeletal system, and disturbance of this system can be

19

a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, *including when assessing an individual's residual functional capacity*, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(Q) (emphasis added).

I do not find, however, that any failure by the ALJ to account expressly for McKenzie's obesity in his RFC determination warrants remand. Prior to this appeal, McKenzie did not allege that his obesity was a factor that aggravated the effects of his injury, *see* R. 14-15; instead, it appears that the ALJ calculated McKenzie's BMI on his own initiative and independently determined that he was obese. R. 21 n.1. The ALJ found that McKenzie's obesity did not require medical treatment or cause more than minimal functional limitations. *Id.* McKenzie has not explained in any detail how his obesity contributes to the limiting effects of his knee injury other than by bare assertion that his weight "clearly compounds the situation." Pl. Br. 26. Indeed, the Record contains no statements from McKenzie or a medical provider about the effects of his obesity on his functioning. Remand would not be appropriate where, as here, a claimant cannot show any additional limitations caused by his obesity beyond those already established by his other impairments. *Lehman v. Astrue*, 931 F. Supp. 2d 682, 691 (D. Md. 2013). In addition, the ALJ relied on the opinion of Dr. Carter, who examined McKenzie in person, noted McKenzie's weight in his report, and presumably accounted for this when making his functional assessment. R. 26–27, 659–62. Therefore, by relying on Dr. Carter's opinion, the ALJ impliedly adopted Dr. Carter's evaluation of the effects of McKenzie's obesity, and any error was harmless. *See Lehman*, 931 F. Supp. 2d at 691–92.

20

McKenzie also contends that the ALJ erred by omitting from his RFC the requirement that, while seated, he be able to elevate his left leg at waist level (not merely extend his leg).[9] Pl. Br. 25–27. Although on the surface the distinction between "extending" and "elevating" seems to be minor, the issue has significant bearing on McKenzie's eligibility for benefits. During the hearing, the ALJ posed a hypothetical to the VE that reflected his ultimate RFC finding, including the need for McKenzie to extend his leg while seated. *Compare* R. 49, *with* R. 22. The VE responded that a person with these limitations would be able to perform less than a full range of light work and sedentary work. R. 49–51. The ALJ then posed a modified hypothetical to the VE, in which McKenzie would need to elevate his leg at waist height, rather than simply extending it. R. 51–52. The VE responded that in the long term this limitation would be work-preclusive, even at the sedentary level. R. 52. Therefore, if substantial evidence does not support the ALJ's finding that McKenzie needs only to extend his leg while seated, rather than elevate it, such an error would affect the ALJ's determination that McKenzie can perform other work in the national economy.

McKenzie claims that the opinions of Dr. Carter and Dr. Astruc affirm the need for him to elevate his leg, Pl. Br. 26, but the record does not bear out his contention. Dr. Carter noted that McKenzie said he "cannot sit in places where he is required to bend his leg." R. 659. Dr. Carter opined that McKenzie "would have to be in a work space where his left leg could easily be extended, which would not work in a lot of standard seated situations, so this would need to be accommodated for." R. 662. Although these statements express some concern about employers' ability to accommodate McKenzie's need to extend his leg, they do not say anything about

---

[9] In his brief, McKenzie himself occasionally conflates the need to "elevate" his leg with the need to "extend" it. When possible, I will interpret any potential contradictions and ambiguities in his argument as a claim that he needs to elevate the leg, as this is a more restrictive limitation.

McKenzie's need to elevate his leg. Similarly, Dr. Astruc opined that McKenzie could "sit without limitation as long as he is able to extend [his] left leg," and that he "would likely need to sit with his left knee extended due to his limited ROM," but did not say anything about the need for McKenzie to elevate his leg. R. 688.

The only sources for McKenzie's claim that he needs to elevate his leg while seated are McKenzie's girlfriend's testimony before the hearing officer, R. 120, and McKenzie's own testimony before the hearing officer, R. 119–20, and before the ALJ, R. 46. The ALJ, however, also noted that he did not find McKenzie to be fully credible with regard to the limiting effects of his symptoms. R. 26. It is not this Court's role to determine whether McKenzie was a credible witness. *See Craig*, 76 F.3d at 589; *Shively v. Heckler*, 739 F.3d 987, 989 (4th Cir. 1984). Rather, the Court must be satisfied that the ALJ applied the correct legal standard in evaluating McKenzie's credibility and that substantial evidence supports his finding that his allegations were not entirely credible. *See Craig*, 76 F.3d at 589; *Dunn v. Colvin*, 973 F. Supp. 2d 630, 640 (W.D. Va. 2013).

If the ALJ makes a credibility determination, his reasoning "must be sufficiently specific to make clear" to the claimant and to reviewing courts how and why he weighed the claimant's statements. SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996); *see also Dunn*, 973 F. Supp. 2d at 639. As long as the ALJ stayed within these bounds, I will not disturb a credibility finding that is supported by substantial evidence in the record. *See Dunn*, 973 F. Supp. 2d at 640. Here, the ALJ provided specific reasons for his credibility determination, including moderate clinical findings, record evidence showing McKenzie's improved functioning, and his lack of medical treatment between 2007 and 2013. R. 26. These are sufficient reasons to support the ALJ's credibility

22

finding. Because McKenzie's subjective report provided the only evidence of a need to elevate his leg, I find that the ALJ did not err in excluding this limitation from McKenzie's RFC.

Furthermore, I find that the ALJ's RFC determination is consistent with the treatment notes, medical opinions, and credible statement about McKenzie's functioning. Accordingly, I find that the RFC is supported by substantial evidence.[10]

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that McKenzie's motion for summary judgment, ECF No. 15, be **DENIED**, the Commissioner's motion for summary judgment, ECF No. 20, be **GRANTED**, the Commissioner's final decision be **AFFIRMED**, and this case be **DISMISSED** from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

---

[10] The ALJ did not expressly include a sit/stand option in the RFC. The VE, however, testified that all of the jobs that he identified that a hypothetical person with McKenzie's RFC could perform included a sit/stand option. R. 53. Thus, this omission, if erroneous, was harmless.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: November 5, 2015

Joel C. Hoppe
United States Magistrate Judge